UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA

-against-

STEVEN HAMILTON,

Defendant.

------------------------------------------------------x

ORIGINAL

D·F
C/M

**MEMORANDUM AND ORDER**
Case No. 07-CR-123 (FB)

*Appearances:*
*For the United States:*
ROSLYNN R. MAUSKOPF, ESQ.
United States Attorney
Eastern District of New York
By: DANIEL A. SPECTOR, ESQ.
Assistant United States Attorney
One Pierrepont Plaza
Brooklyn, New York 11201

*For the Defendant:*
DOMINIC F. AMOROSA, ESQ.
95 Worth Street
New York, New York 10013

**BLOCK, Senior District Judge:**

Defendant, Steven Hamilton ("Hamilton"), is charged with one count of possessing counterfeit currency in violation of 18 U.S.C. § 742; the charge arises from an alleged attempt to deposit approximately $5,000 in counterfeit currency at a bank in Brooklyn. Hamilton moves to suppress certain post-arrest statements on the ground that they were taken in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The Court held a suppression hearing on June 7, 2007, following which the parties submitted post-hearing memoranda. For the reasons set forth below, the motion to suppress is denied in part and granted in part.

**I.**

The following facts are taken from the testimony of the sole witness at the suppression hearing, Secret Service Agent Arturo De Simone ("De Simone"):

On December 22, 2006, De Simone arrested Hamilton at the bank and informed him of his *Miranda* rights; Hamilton responded that he understood his rights and wished to speak to a lawyer. De Simone then handcuffed Hamilton and, with another agent, escorted him to De Simone's vehicle.

During the walk to the vehicle, Hamilton "began to make statements in regards to . . . work[ing] with the Secret Service before, [and] [t]hat he didn't believe this was happening to him; that he was doing a favor for a friend," Tr. at 7;[1] according to De Simone, none of these statements was in response to questioning. De Simone and the other agent then seated Hamilton in the back seat and drove to the Secret Service field office.

At the outset of the trip, Hamilton reiterated: "I can't believe this is happening to me. How could I have been so stupid? I was doing a favor for a friend." Tr. at 8. After reminding Hamilton of his *Miranda* rights, De Simone asked Hamilton "if the friend he was referring to was the same friend that was present with him at the bank at the time the transaction took place"; Hamilton responded "yes." *Id.* De Simone then asked Hamilton to provide his friend's name; Hamilton declined, stating that "[h]e preferred to talk to a lawyer first before giving any information." *Id.* at 9. De Simone stopped his questioning.

"A few minutes later," Hamilton repeated: "How could I have been so stupid? I was doing a favor for a friend. I end up getting arrested for it. I can't believe this is happening to me." Tr. at 9. As before, De Simone advised Hamilton of his rights and then made the following proposition: "[F]rom what you're telling me it sounds like . . .

---

[1]Citations are to the transcript of the June 4, 2007 suppression hearing.

you're pointing the finger at somebody else. Why don't you tell us who this person is so we can attempt to help you or find out the identity of this person and question him." *Id.* at 9-10. De Simone testified that he had made this suggestion because he " believed [that Hamilton] was making those statements [ ] because he wanted to help himself." *Id.* at 23.

This time, Hamilton identified his friend as "D" or "Dee." Tr. at 10. In response to further questions from De Simone, Hamilton stated (1) that he did not know Dee's last name, (2) that he had been friends with Dee "for a few years," and (3) that Dee lived in Brooklyn. *Id.* at 10. When De Simone asked Hamilton if he "had Dee's cell number and if he was willing to provide it," Hamilton responded that the number was "stored in his phone," but that he "wished to talk to a lawyer before he gave any information." *Id.* at 10-11. Once again, De Simone discontinued his questioning.

After "a few minutes went by again," Tr. at 11, Hamilton began repeating the same statements. At that point, De Simone asked Hamilton what favor he was doing for his friend; Hamilton responded that "he was trying to get his friend a check or bank check in order to be used for good faith deposit for property in New Jersey." *Id.* at 11.

Finally, after an additional period of silence, Hamilton spontaneously stated that "he had a great wife and a nice house and a good job and a nice car." Tr. at 12. De Simone asked whether the car he was referring to was the 2006 Mercedes Benz that he had seen parked at the bank; Hamilton responded that it was and that "it was fully paid for." *Id.* De Simone then questioned Hamilton about his salary because the presumably high price of the car made him "curious [about] his yearly income"; in response, Hamilton stated that he "made about forty or $50,000 a year." *Id.* at 12-13. De Simone then asked

whether that "included tips," to which Hamilton responded that "people at the [Roosevelt Hotel, where Hamilton worked as a bellhop] tip very poorly." *Id.* at 13. When De Simone asked Hamilton how he could afford his car on his income, Hamilton stated that "the car was not fully paid for." *Id.* The remainder of the trip to the Secret Service field office passed in silence.

## II.

Hamilton's statements fall into two categories. The first consists of four statements to the effect that he was doing a favor for a friend, plus the one statement to the effect that he had a good job and a nice car. The Court credit's Agent De Simone's testimony that these five statements were not made in response to any questioning; therefore, they are admissible. *See United States v. Miller*, 116 F.3d 641, 680 (2d Cir. 1997) ("If, after receiving *Miranda* warnings and invoking the right to counsel, the accused himself initiates further communication, exchanges, or conversations with the police, those unsolicited statements are admissible." (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).

The second category consists of the statements Hamilton made in response to the questioning prompted by his spontaneous statements. The Government argues that "so long as the defendant has reinitiated the communication, he may be interrogated, even where he previously invoked his right to counsel." Gov't's Mem. of Law at 7. In support of this argument, the Government cites *Miller*, as well as *United States v. Montana*, 958 F.2d 516 (2d Cir. 1992), *United States v. Colon*, 835 F.2d 27 (2d Cir. 1987), *United States v. Annucci*, 2007 WL 1310156 (S.D.N.Y. May 3, 2007), and *United States v. Herbin*, 2005 WL 2789047 (D.

Vt. 2005).

*Miller* and *Herbin*, however, dealt only with spontaneous statements, not responses to follow-up questioning. *See Miller*, 116 F.3d at 680 ("[After defendant invoked his *Miranda* rights,] there was no further questioning or comment on the case by the agents. After several minutes, [the defendant] blurted out 'that he wasn't a big guy like Fat Cat, he hadn't hurt anybody, he had just sold some drugs to take care of his children.'"); *Herbin*, 2005 WL 2789047, at *5 ("[I]t was [the defendant] who initiated the conversation with the agents by asking about the nature of the charges."). While there was one follow-up question in *Colon*, the Second Circuit's decision focused solely on the volunteered statement. *See Colon*, 835 F.2d at 30 ("Judge Bartels found that [the defendant's] statement was spontaneous and not the product of an interrogation or its functional equivalent. We agree. Colon [the defendant] was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts.").

*Annucci* also addressed only spontaneous statements, *see* 2007 WL 1310156, at *5 ("According to the testimony of the three agents, the incriminating statements made by Defendant in the car were unsolicited . . . and I credit this testimony."); indeed, the court did not need to address the legality of follow-up questioning because "[t]he Government concede[d] that [the agent's] follow-up question to Defendant's incriminating statements, i.e., what did Defendant mean by "playing ball," constituted interrogation," and, therefore, "did not seek to admit any statements made by Defendant after [the agent] posed the question." *Id.* at *6.

The last case cited by the Government – *Montana* – expressly recognized the

5

distinction between spontaneous statements and responses to follow-up questions: "At a minimum, [the defendant's] spontaneous and unsolicited declaration was admissible. However, because [the agent's] follow-up responses constituted 'interrogation,' we must decide whether [the defendant's] initial unsolicited, inculpatory remark waived his right to remain silent." 958 F.2d at 519.

As *Montana* illustrates, the legality of follow-up questioning turns on whether the defendant's unsolicited statement constitutes a waiver of previously invoked *Miranda* rights: "If there is questioning after the arrestee invokes his right to counsel, his responses may be admitted in evidence 'only on finding that [the arrestee] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.'" *Miller*, 116 F.3d at 680 (quoting *Smith v. Illinois*, 469 U.S. 91, 94 (1984)). Waiver must be assessed under "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Edwards*, 451 U.S. at 486 n.9. The Government bears the burden of proving waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

De Simone's testimony does not persuade the Court that Hamilton's unsolicited statements were intended to "initiate further discussions" or "reopen the dialogue" with law enforcement; it seems more likely that Hamilton was simply bemoaning his fate to no one in particular. Nevertheless, the Court recognizes that in *Montana*, the Second Circuit found that similar statements – "I can't believe I'm in all this trouble for only $50" – "clearly initiated the conversation" with the authorities. *See* 958 F.2d at 519.

6

But even assuming that Hamilton was initiating conversations with De Simone, the Court finds that his unsolicited statements did not, considering the totality of the circumstances, amount to a waiver of his previously invoked *Miranda* rights. The first such statement was made after he had been handcuffed and was being led to De Simone's car; in addition, the Government has not established that there was any significant lapse of time between the initial invocation of his *Miranda* rights and his first spontaneous statement. This is markedly different from *Montana*, in which the statement was made "in the non-threatening surroundings of a Magistrate Judge's hearing room" and "some four hours" after the defendant had invoked his *Miranda* rights, circumstances with the Second Circuit held supported the inference that the defendant had had "ample opportunity to reassess his situation and voluntarily determine whether to waive his constitutional right." 958 F.2d at 519.

Hamilton's subsequent unsolicited statements are even less suggestive of waiver. After answering one question triggered by his first spontaneous statement, he clearly reinvoked his desire to speak to an attorney before answering any further questions; after answering several questions triggered by the second statement, he once again reinvoked. These reinvocations countermand whatever inference of waiver might otherwise be drawn from Hamilton's unsolicited statements; it simply does not make sense to say that, after first invoking his *Miranda* rights, Hamilton changed his mind, then reinvoked, then changed his mind again, then reinvoked again, then changed his mind one last time, all in a short space of time over the course of the drive to the field office.

Finding no waiver, the Court holds that De Simone's questioning violated

Hamilton's *Miranda* rights. The responses to the questions must, therefore, be suppressed.

## III.

Insofar as it seeks to suppress the five spontaneous statements, Hamilton's motion is denied. Insofar as it seeks to suppress the responses to De Simone's questioning it is granted; accordingly, the Government is precluded from offering the following statements into evidence:

1.    Hamilton's affirmation that "the friend he was referring to was the same friend that was present with him at the bank at the time the transaction took place." Tr. at 8.

2.    The statements that the friend's name was "Dee," that Hamilton did not know Dee's last name, that Hamilton had known him "for a few years," that Dee lived in Brooklyn, and that Hamilton had Dee's cell phone number "stored in his phone." Tr. at 10-11.

3.    The statement that Hamilton "was trying to get his friend a check or bank check in order to be used for good faith deposit for property in New Jersey." Tr. at 11.

4.    The statements that the 2006 Mercedes Benz in the bank parking lot belonged to Hamilton, that the car was paid for, that he made $40,000 to $50,000 a year, that the patrons of the hotel where he worked "don't tip that well," as well as the final inconsistent statement that the car was not paid for. Tr. at 12-13.

**SO ORDERED.**

/signed/
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 3, 2007

8